UNITED CHURCH OF CHRIST *v.* TOWN OF WEST HARTFORD
(13127)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued January 12—decision released March 29, 1988

*Michael J. O'Sullivan,* with whom, on the brief, was *Richard T. Stabnick,* for the appellant (plaintiff).

*Marjorie S. Wilder,* corporation counsel, for the appellee (defendant).

ARTHUR H. HEALEY, J. The plaintiff United Church of Christ was denied a local property tax exemption under General Statutes § 12-88[1] when the trial court found, on an appeal from the local board of tax review, that the land involved in its housing project in West Hartford was not being used exclusively for charitable purposes under General Statutes § 12-81 (7).[2] The

---

[1] General Statutes § 12-88 provides: "WHEN PROPERTY OTHERWISE TAXABLE MAY BE COMPLETELY OR PARTIALLY EXEMPTED. Real property belonging to, or held in trust for, any organization mentioned in subdivision (7), (10), (11), (13), (14), (15), (16) or (18) of section 12-81, which real property is so held for one or more of the purposes stated in the applicable subdivision, and from which real property no rents, profits or income are derived, shall be exempt from taxation though not in actual use therefor by reason of the absence of suitable buildings and improvements thereon, if the construction of such buildings or improvements is in progress. The real property belonging to, or held in trust for, any such organization, not used exclusively for carrying out one or more of such purposes but leased, rented or otherwise used for other purposes, shall not be exempt. If a portion only of any lot or building belonging to, or held in trust for, any such organization is used exclusively for carrying out one or more of such purposes, such lot or building shall be so exempt only to the extent of the portion so used and the remaining portion shall be subject to taxation."

[2] General Statutes § 12-81 (7) provides: "Property used for scientific, educational, literary, historical or charitable purposes. Exception. Subject to the provisions of sections 12-87 and 12-88, the real property of, or held in trust for, a corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes

sole issue on this appeal is whether, on the facts found by the trial court, the plaintiff sustained its burden of proving that its housing project was being used exclusively for charitable purposes.[3]

The town assessor of West Hartford placed certain housing units then constructed on the plaintiff's property on the tax list of October 1, 1982. The plaintiff church appealed to the board of tax review for the town of West Hartford, requesting a tax exemption on the ground that the property was being used exclusively for a charitable purpose. The board denied the petition and the plaintiff appealed to the Superior Court. *Hon. Charles S. House,* state trial referee, acting as the court, found that the property was not eligible for an exemption and dismissed the appeal. The plaintiff then appealed to the Appellate Court, which, with one judge dissenting, sustained the trial court's decision. *United Church of Christ* v. *West Hartford,* 9 Conn. App. 448, 519 A.2d 1217 (1987). The plaintiff successfully petitioned for certification from this court and this appeal followed.

and used exclusively for carrying out one or more of such purposes and the personal property of, or held in trust for, any such corporation, provided (a) any officer, member or employee thereof does not receive or at any future time shall not receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiary of its strictly charitable purposes, and provided (b) in 1965, and quadrennially thereafter, a statement on forms prepared by the secretary of the office of policy and management shall be filed on or before the last day required by law for the filing of assessment returns with the local board of assessors of any town, consolidated town and city or consolidated town and borough, in which any of its property claimed to be exempt is situated. On and after July 1, 1967, housing subsidized, in whole or in part, by federal, state or local government and housing for persons or families of low and moderate income shall not constitute a charitable purpose under this section."

[3] The issue certified for appeal is: "On the facts found by the trial court, did the plaintiff sustain its burden of proving that its West Hartford housing project was being used exclusively for charitable purposes as that term is defined in General Statutes § 12-81 (7)?"

The trial court found the following facts which are not in dispute. The plaintiff, incorporated as a nonstock corporation in 1958, acquired approximately six acres of land on Flagg Road in West Hartford. It constructed a church building on two acres, leaving about four acres of the property unused, on which it paid property tax to the town of West Hartford. The plaintiff, perceiving a need for elderly housing in the community, created a committee in 1978 to make a feasibility study of the use of the land for such housing. In November, 1979, the congregation voted to approve the project.[4] The plaintiff obtained a zoning change and proceeded to develop the four acres into an elderly housing project known as Hart Meadow Village (Hart Meadow). The plaintiff planned to construct sixteen residential units, each with two bedrooms and equipped with range, refrigerator, air conditioning, carpeting, garbage disposal and master television antenna. Grounds maintenance, project lighting and on-site parking were also included in the plans. It was anticipated that the project would be administered by Church Homes, Inc., as a subsidiary of its Avery Heights project on New Britain Avenue in Hartford. It was also planned that a full range of recreational, support and health services would be provided for the project's occupants, including pastoral counseling provided by the church minis-

---

[4] The United Church of Christ congregation, at a meeting called to discuss the Hart Meadow project, voted: "Whereas our congregation feels that a portion of our outreach ministry can be accomplished by the provision of housing on our property for the elderly, and Whereas Phase I of the Feasibility Study has reviewed plans and concepts for such housing which are felt to accomplish our intended purpose and, Whereas there is reason for optimism of success through the efforts of our congregation with guidance and assistance from Church Homes and the Connecticut Conference, it is therefore Moved that the congregation authorize the expenditure by the Hart Meadow Project Committee of approximately $7,000 of church funds so that they may proceed with Phase II of the Feasibility Study involving detailed planning and a zoning application with the town government. If the project is successful, the $7,000 will become part of the capitalization expense and will be returned to the church."

ter, support in arranging convalescent services, use of church facilities for cultural and recreational affairs and coordination of public and private transportation.

The plaintiff anticipated that 87 percent of the projected total cost of $1,212,483 would be funded by gifts, with the balance provided by a commercial loan to the church, which would hold title to all of the real estate. The "gifts" would consist of a one-time unrestricted payment of $73,000 by individual donors, each of whom would receive the privilege of occupying one housing unit as long as he or she was able to live there independently. The occupants would be charged a monthly maintenance fee of $350 per unit,[5] with the only other requirement being that one of the occupants be at least sixty-two years of age. There would be no lease or written contract concerning the occupancy other than a letter from the church specifying the occupant's right, privileges and commitments for the maintenance costs. When a unit was vacated, Church Homes, Inc., would choose another tenant, who would be able to occupy the unit under the same restrictions and subject to the same commitment to pay the maintenance fee but not the up-front charge of $73,000.

Six units had been completed and occupied at the time of trial and the remaining units were to be erected as the plaintiff received further donations for construction. At the hearing in the trial court, it was revealed that there had been discussions with town authorities about what would be done with the property if it were

[5] There was a conflict concerning the amount of the monthly maintenance fee. The plaintiff claims the record shows that it was $275 per month since the fee had been adjusted to allow tenants to pay their own electric bills due to varying amounts of usage. The trial court found that the fee was $350. This dispute is irrelevant on the issue before us since the facts indicate that a fee of $350 with electricity included is roughly equivalent to a fee of $275 without electricity included. Since the tenant is paying for his own electricity under either system, the dispute does not implicate the issue of whether the project is self-supporting.

sold, but no understanding had ever been reached. The trial court found that "[i]t does not appear that any provision has been made for such a contingency or if the church ceases to function or decides to sell the property nor for any restriction against its sale." There is no restriction to occupancy by reason of race, creed, color or church membership. In fact, most of the current occupants are not members of the plaintiff church. The trial court found that "it is significant that there is no restriction or limitation whatsoever upon the extent of the wealth or income of anyone selected for occupancy of the units." The project is not limited to poor, sick, infirm or the low-income elderly. The trial court concluded that the lack of any financial qualification was of "critical significance" on the issue of charitable purpose.

After setting out the criteria for obtaining a tax exemption under General Statutes § 12-88, the trial court held that the plaintiff had failed to discharge its burden of proving that the property was used exclusively for charitable purposes. It pointed to the fact that there was nothing to indicate that (1) the project is not and will not be self-supporting, and (2) admission to those who can afford to pay for it will make it less likely that they would become burdens on society.[6]

---

[6] The plaintiff moved the court to articulate the bases for its decision and the trial court responded as follows: "(1). To articulate what standard of proof the trial court required the Plaintiff-apellant to meet in order to sustain its burden of proof in the tax appeal.

"(2) To articulate whether the trial court found the necessity of service to or for the poor as a standard for charitable exemption under Section 12-81 (7) of the Connecticut General Statutes.

"(3) For the State Trial Referee to take judicial notice of the Senior Citizen Act of 1962, Section 236 of Title 12, Section 1701 of the U.S. Code which provides that housing for the elderly is a paramount concern of the Nation and Congress.

"(4) To articulate how or why, based on the evidence produced at trial and present law, the Plaintiff-appellant failed to meet the required standard of proof."

The Appellate Court affirmed the trial court decision. Although it recognized the modern trend of broadening the concept of charitable purpose as articulated in *Camp Isabella Freedman of Connecticut, Inc.* v.*Canaan,* 147 Conn. 510, 162 A.2d 700 (1960), the Appellate Court held that, in light of the fact that there are no limits on wealth or income and that initial tenants must pay a $73,000 up-front payment, "the claim that the plan is charitable is stretching the concept to the breaking point and beyond." *United Church of Christ* v. *West Hartford,* supra, 456. The majority opinion also agreed with the trial court's conclusion that the church had not proven that the project is not and will not be self-supporting. Using the proper standard of whether the decision was clearly erroneous in light of the evidence and pleadings in the record as a whole; Practice Book § 4061; the Appellate Court held that the trial court could reasonably and logically conclude as it did. Id., 459.

On appeal, the plaintiff claims that, on the facts found by the trial court, it has sustained its burden of prov-

In response, the court filed a supplemental memorandum of decision as follows: "(1) The court required that the plaintiff prove by a fair preponderance of the evidence that the property which was the subject of its appeal was exempt from taxation by the defendant town.

"(2) The Court did not find that service to or for the poor is an exclusive necessary requirement for charitable exemption under the provisions of General Statutes Section 12-81 (7) but did consider it as a significant criterion in determining whether property is being used exclusively for charitable purposes.

"(3) The Court did not take judicial notice of the Senior Citizen Act of 1962, Section 236 of Title 12, Section 1701 of the U.S. Code and was not requested to do so, nor was it called to the Court's attention at the trial. (*See Wood* v. *Wood,* 165 Conn. 777, 780 [345 A.2d 5 (1974).])

"(4) As to the plaintiff's request that the Court articulate how and why the plaintiff failed to sustain its burden of proof, the court is unaware of what evidence may have been available to support the plaintiff's contention but, as noted in the Memorandum of Decision, it is concluded that the plaintiff failed to prove that the property in question is now devoted to and used exclusively for charitable purposes."

ing that the Hart Meadow project was being used exclusively for charitable purposes. We disagree.

Under our statutes, there are three requirements for a tax exemption. The property must belong to or be held in a trust for an organization exempt from taxation under the provisions of General Statutes § 12-81; it must be held for one of the purposes stated in that statute's list of exemptions; and it must produce no rent, profits or income. The trial court concluded that the plaintiff had failed to meet the exemption available in § 12-81 (7) for property used exclusively for charitable purposes.

A general description of the burden of proving a tax exemption was aptly articulated in *Faith Center, Inc.* v. *Hartford,* 39 Conn. Sup. 142, 473 A.2d 342 (1982), aff'd, 192 Conn. 434, 472 A.2d 16, cert. denied, 469 U.S. 1018, 105 S. Ct. 432, 83 L. Ed. 2d 359 (1984), an analysis cited with approval in the Appellate Court opinion. That court said: "Certain general principles of law govern cases such as the present ones where a party claims that property is exempt from taxation. ' "It is a settled rule of law that statutes which exempt from taxation are to be strictly construed against the party claiming an exemption." ' *Crescent Beach Assn.* v. *East Lyme,* 170 Conn. 66, 71, 363 A.2d 1045 (1976); *Wiegand* v. *Heffernan,* 170 Conn. 567, 582, 368 A.2d 103 (1976); *Hartford Hospital* v. *Board of Tax Review,* 158 Conn. 138, 147, 256 A.2d 234 (1969). 'Exemptions, no matter how meritorious, are of grace, and must be strictly construed. They embrace only what is strictly within their terms.' *Hartford* v. *Hartford Theological Seminary,* 66 Conn. 475, 482–83, 34 A. 483 (1895); *Woodstock* v. *The Retreat, Inc.,* 125 Conn. 52, 56, 3 A.2d 232 (1938). As the Supreme Court noted in *Snyder* v. *Newtown,* 147 Conn. 374, 386, 161 A.2d 770 (1960), appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688 (1961): 'Exemption from taxation is the equiva-

lent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702 [1947]. The owners of tax-exempt property in the community derive the same benefits from government as other property owners but pay no property taxes for those benefits.'

"It is also well settled that the burden of proving entitlement to a claimed tax exemption rests upon the party claiming the exemption. *Curly Construction Co.* v. *Darien,* 147 Conn. 308, 160 A.2d 751 (1960); *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 154 A.2d 608 (1959); *Cooley Chevrolet Co.* v. *West Haven,* 146 Conn. 165, 148 A.2d 327 (1959); *Forman Schools, Inc.* v. *Litchfield,* 14 Conn. Sup. 444, rev'd on other grounds, 134 Conn. 1, 54 A.2d 710 (1947)." *Faith Center, Inc.* v. *Hartford,* supra, 153–54.

This court has recognized that the "definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men." *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 514. The *Camp Isabella* court continued: "It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. *Bader Realty & Investment Co.* v. *St. Louis Housing Authority,* 358 Mo. 747, 752, 217 S.W.2d 489 [1949]. Charity embraces anything that tends to promote the well-doing and the well-being of social man. Ibid. An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust. *Davie* v. *Rochester Cemetery Assn.,* 91 N.H. 494, 495,

23 A.2d 377 [1941]." Id., 514–15. Other jurisdictions have also recognized the increasingly broad definition of charitable purpose. See, e.g., *Fredericka Home for the Aged* v. *County of San Diego,* 35 Cal. 2d 789, 792–93, 221 P.2d 68 (1950); *Oasis, Midwest Center for Human Potential* v. *Rosewell,* 55 Ill. App. 3d 851, 858, 370 N.E.2d 1124 (1977); *Rosser* v. *Prem,* 52 Md. App. 367, 384, 449 A.2d 461 (1982).

The plaintiff claims that it has proven that the property was being used exclusively for a charitable purpose. The main flaw in the plaintiff's argument is that it is trying to establish a present tax exemption based on future intentions. We must, however, examine the current state of the Hart Meadow project on the facts found by the trial court. "It is the actual use being made of the property on the tax day which is determinative, not the use intended for the future. *Gillette* v. *Hartford,* 31 Conn. 351, 359 [1863]." *Arnold College* v. *Milford,* 144 Conn. 206, 211, 128 A.2d 537 (1957). In this case, the trial court found that six units had been constructed at the time of trial. The six occupants had paid the up-front fee of $73,000 and were paying a monthly maintenance fee of $350. There had been no limitation on wealth or income for the current occupants. The only requirement had been that one occupant in each unit be at least sixty-two years old. The dispositive conclusion made by the trial court was that there had been nothing to indicate either that the project had not been self-supporting or that the admission of its residents would make it less likely that such residents would become burdens on society.

The payment of the $73,000 and the monthly maintenance fee of $350 support the conclusion that the project is self-supporting. On cross-examination, the pastor of the plaintiff, Reverend Edward Mayes, testified that the monthly fee "covers all our maintenance costs, the lawn care, the snow removal, all repairs on

the cottages inside and out. A portion is being set aside for long-term maintenance, insurance and debt amortization." Mayes also testified that the facility is financing itself. When asked about what services are provided by the plaintiff to the project, Mayes testified that members of the church have helped out with "the weeding and the landscaping." He also stated that the church members would help the residents "utilize the various agencies in the community." When questioned about the health care that the plaintiff provided to the Hart Meadow residents, Mayes testified that the plaintiff had been negotiating with a doctor to be on call twenty-four hours a day for emergencies.

The Appellate Court was correct in concluding that the plaintiffs had failed to prove that the project is not now self-supporting. The plaintiff is presently under no legal obligation to provide any services that would impose any significant financial burden on it. The monthly fee covers virtually all the plaintiff's expenses. The incidental auxiliary services (i.e., weeding and landscaping) offered by the plaintiff do not raise the entire project to an exclusive charitable use entitled to a tax exemption. Unlike other projects that provide "lifetime" health care; see, e.g., *Fredericka Home for the Aged* v. *County of San Diego,* supra, 790; *In re Central Union Church,* 63 Hawaii 199, 201–202, 624 P.2d 1346 (1981); Hart Meadow has merely volunteered to negotiate with a doctor to provide care, presumably for a fee charged directly to the residents who receive such services. Church Homes, Inc., has facilities that provide more extensive health care, but a Hart Meadow resident who is unable to care for himself or herself is guaranteed only a spot on the waiting list for Church Homes, Inc. A Hart Meadow resident who is admitted to Church Homes, Inc., is liable for those fees charged to any resident of the Church Homes, Inc.'s facilities. Although the return on its money is not as great as it previously was, the plaintiff's initial investment of

$60,000 is being paid back. We agree with the Appellate Court that the trial court's finding that there is nothing to indicate that the project is not self-supporting was not clearly erroneous.

The trial court also found that the plaintiff did not prove that the project would make it less likely that the residents would become burdens on society. The record is clear that all initial residents must pay $73,000 and that there are no income or wealth restrictions on applicants. On cross-examination, Mayes even admitted that all the residents could be millionaires. At the time of the trial, all six residents had paid $73,000 and were currently paying $350 a month in fees. The project was open only to residents who are able to take care of themselves and live independently. Once residents were unable to do so, they could no longer live at Hart Meadow. The plaintiff attempts to ameliorate these rather stringent conditions for living at Hart Meadow by explaining that Hart Meadow follows the procedures of Church Homes, Inc., in that Church Homes, Inc., has never evicted anyone for an inability to pay the maintenance fee and that arrangements are made for subsidies when necessary. Although the plaintiff claims it is obligated to follow these procedures because of its agreement with Church Homes, Inc., there is no such obligation to the residents themselves. This is another example of the plaintiff asking for a tax exemption based on future intentions. The fact remains that at present Hart Meadow is open only to those elderly persons who can afford a down payment of $73,000, a monthly fee of $350 and are able to take care of themselves. How this project keeps these elderly persons from becoming burdens on society is not indicated by the record. Hart Meadow is inaccessible for those elderly who have no capital, no steady income and are unable to take care of themselves. See *Evangelical Retirement Homes* v. *State Tax Commission,* 669 S.W.2d. 548, 554 (Mo. 1984) (the "public nature of a

charity is diminished when it is systematically denied to those who need and can least afford the service"). These low-income elderly, concededly unable to reside as initial residents of Hart Meadow, are much more likely to become burdens on society absent governmental or charitable intervention than those who qualify for Hart Meadow. The plaintiff has not sustained its burden of proving that its project will make it less likely that its elderly residents will become burdens on society.

This court faced a similar claim in *Waterbury First Church Housing, Inc.* v. *Brown,* 170 Conn. 556, 367 A.2d 1386 (1976), and held that a nonprofit housing corporation that rented apartments to the elderly at below market rates was not exempt from the sales and use tax under General Statutes (Rev. to 1975) § 12-412 (h). Although the corporation was held to have been organized for a charitable purpose; id., 561; this court held that "the manner and means it adopts for the accomplishment of those purposes" also must be exclusively charitable. Id., 562. The court emphasized the requirement that the organization's income be based on " 'private sources which are spent for the public weal.' " Id., 563. Quoting *Corbin* v. *Baldwin,* 92 Conn. 99, 107, 101 A. 834 (1917), this court stated: " '[T]he exemptions are given for the assistance and help of the private endeavor in its effort to advance the public interest or to perform some share of the public governmental duty. . . . The amount of taxes which are lost to the State and its political subdivisions by reason of exemptions are of trifling consequence as compared with the *sums coming from private sources which are spent for the public weal.'* (Emphasis added.)" *Waterbury First Church Housing, Inc.* v. *Brown,* supra, 563–64. The plaintiff is unable to claim that government would have to intervene in the public interest had the plaintiff not provided the Hart Meadow project. The reasoning and

result in *Waterbury First Church Housing, Inc.* v. *Brown,* supra, supports the trial court's conclusion in this case.

Although requests for tax exemptions are evaluated under the specific facts and applicable state statute before us; *Presbyterian Homes* v. *Division of Tax Appeals,* 55 N.J. 275, 286, 261 A.2d 143 (1970); a survey of other jurisdictions reveals that the majority deny a property tax exemption under similar circumstances. A number of projects were quite similar to Hart Meadow in that they had an initial endowment fee, a moderate maintenance fee, and only those in reasonably good health were eligible. See generally annots., 37 A.L.R.3d 565, 1191. The fact that inability to pay precluded the most needy from being members was a key reason for the denial of a tax exemption. See, e.g., *Appeal of Sunny Ridge Manor, Inc.,* 106 Idaho 98, 103, 675 P.2d 813 (1984); *Michigan Baptist Homes & Development Co.* v. *Ann Arbor,* 396 Mich. 660, 671, 242 N.W.2d 749 (1976); *Madonna Towers* v. *Commissioner of Taxation,* 283 Minn. 111, 122, 167 N.W.2d 712 (1969); *Evangelical Retirement Homes* v. *State Tax Commission,* supra, 557; *Presbyterian Homes* v. *Division of Tax Appeals,* supra, 287; *In re Appeal of Barham,* 70 N.C. App. 236, 244, 319 S.E.2d 657 (1984); *Appeal of Marple Newtown School District,* 500 Pa.160, 165, 455 A.2d 98 (1982). Another key factor in denying tax exemption was the lack of a legal commitment to provide care for those residents who subsequently were unable to pay the fees. See, e.g., *Evangelical Retirement Homes* v. *State Tax Commission,* supra, 553; *Presbyterian Homes* v. *Division of Tax Appeals,* supra, 286; *In re Appeal of Barham,* supra; *Appeal of Marple Newtown School District,* supra. Although the plaintiff introduced considerable testimony that Church Homes, Inc., had a history of not denying services to

those who subsequently became unable to pay the required fees, the fact remains that the commitment by the plaintiff is only a moral one.

There are some jurisdictions that grant a tax exemption for housing for the elderly. See, e.g., *Fredericka Home for the Aged* v. *County of San Diego,* supra, 794–95; *In re Central Union Church,* supra, 204–205; *Hilltop Manor* v. *County Board of Review of Marion County,* 346 N.W.2d 37, 40 (Iowa App. 1984). There are some distinguishing factors in these cases that are not present in the Hart Meadow project. See, e.g., *Fredericka Home for the Aged* v. *County of San Diego,* supra, 791 (35 percent of the operating costs were paid by donations and "life care" contracts were provided); *In re Central Union Church,* supra, 207 (the contract provided that a resident would never be asked to leave); *Hilltop Manor* v. *County Board of Review of Marion County,* supra, 38 (all construction costs were paid with donations). Even if these factors do not make the Hart Meadow project distinguishable, we conclude that, given the facts presented in this case, the reasoning of the majority of jurisdictions is more persuasive.

Both the plaintiff and the dissenting opinion in the Appellate Court rely heavily on general language from various federal[7] and state[8] statutes that articulate a governmental concern for the elderly's particular needs including suitable and affordable housing. On the other hand, the defendant points out that the state statutes that do apply to provision of housing for the elderly specifically provide for payments to municipalities in lieu of taxes or state grants to municipalities for the housing developed under these programs. The defendant claims that this shows that the state is aware of the impact that tax exemptions have on municipalities.

---

[7] See, e.g., Older Americans Act of 1965, Pub. L. No. 89-73 § 101, 79 Stat. 219; HRS Chapter 349, S.L.H. 1976, c. 217.

[8] See, e.g., General Statutes §§ 8-112a, 8-119d and §§ 17-135a through 17-137f.

We agree with the defendant. The legislature is aware of both the needs of the elderly and the role that local property taxes play in the local government. A number of statutory provisions take the competing concerns into account not only by aiding the development of such housing but also by providing fiscal relief to the municipalities that take part in those programs. These statutes provide that payments are to be made by developers to the municipalities in lieu of taxes. See, e.g., General Statutes §§ 8-118a,[9] 8-119k;[10] see also General Statutes § 8-216 (state reimbursement for tax abatements for low and moderate income housing); General Statutes § 12-170d (state refund of utility bills for renters over sixty-five years old). Viewing the legislature's actions in light of the maxim that "statutes which exempt from taxation are to be strictly construed against the party claiming an exemption"; *Hartford*

---

[9] General Statutes § 8-118a provides: "PAYMENTS IN LIEU OF TAXES AND ASSESSMENTS. In lieu of real property taxes, special benefit assessments and sewerage system use charges otherwise payable to a municipality, a local authority shall pay each year, to the municipality in which any of its housing projects for elderly persons is located, a sum to be determined by the municipality with the approval of the commissioner of housing not in excess of ten per cent of the shelter rent per annum for each occupied dwelling unit in any such housing project hereunder; except that the amount of such payment shall not be so limited in any case where funds are made available for such payment by an agency or department of the United States government, but no payment shall exceed the amount of taxes which would be paid on the property were the property not exempt from taxation."

[10] General Statutes § 8-119k provides: "PAYMENT IN LIEU OF TAXES. In lieu of real property taxes, special benefit assessments and sewerage system use charges otherwise payable to a municipality, an eligible developer approved by the commissioner of housing for state financial assistance for a congregate housing project shall pay each year, to the municipality in which any of its congregate housing projects for the lelderly is located, a sum to be determined by the municipality with the approval of the commissioner of housing not in excess of ten per cent of the shelter rent per annum for each occupied dwelling unit in any such housing project hereunder; except that the amount of such payment shall not be so limited in any case where funds are made available for such payment by an agency or department of the United States government, but no payment shall exceed the amount of taxes which would be paid on the property were the property not exempt from taxation."

*Hospital* v. *Board of Tax Review,* 158 Conn. 138, 147, 256 A.2d 234 (1969); we hold that the trial court correctly determined that the plaintiff was not entitled to a tax exemption under General Statutes § 12-81 (7).

We therefore affirm the judgment of the Appellate Court.

In this opinion the other justices concurred.